## HETTRICK MFG. CO. v. WAXAHACHIE COTTON MILLS.

(Circuit Court of Appeals, Sixth Circuit. October 7, 1924.)

No. 3960.

**1. Appeal and error ⟐997(3)—Review of ruling on motions by both parties for directed verdict.**

Where both parties move for a directed verdict, the reviewing court is limited to determining whether there was any substantial evidence on which the trial court properly could have found the facts necessary to support the judgment.

**2. Sales ⟐62—Sale contract held divisible.**

A contract for sale and purchase of 400,000 yards of cotton cloth, with weekly shipments of 10,000 yards, shipping directions to be given by buyer later, and providing that defects in quality or delays in shipments should not be cause for cancellation of any portion of the contract other than the shipment in question, was in effect 40 separate contracts for 10,000 yards each, and the seller's rights under any one of these separate contracts could not be affected by its breach of any of the others in the matter of quality of the goods shipped, or time of shipment, nor could it be in default as to any shipment until it had received shipping directions therefor.

**3. Sales ⟐90—Final formal writing held to constitute the contract between the parties.**

Where an offer and acceptance by telegraph were followed by a sale note, and later by a formal writing signed by the parties, providing that all understandings and agreements were embodied therein, the latter constituted the contract of sale, and terms and conditions contained therein, not mentioned in the previous writings, which were treated as negotiations, did not constitute an amendment of or addition to a prior existing contract, and were not invalid as without consideration.

**4. Contracts ⟐313(1)—Party not bound to accept anticipatory breach.**

A party to an executory contract is not bound to accept an anticipatory breach by the other party, but may treat the contract as still in force, and sue for nonperformance when due; but in that case he is still bound by its terms, and must complete performance on his part.

**5. Sales ⟐153 — Seller not bound to make tender.**

Plaintiff sold to defendant a large quantity of cotton cloth, to be manufactured and shipped in weekly installments of 10,000 yards, defendant to give shipping directions; the contract providing that defects in quality or delays in shipment should not be cause for cancellation of any portion of the contract other than the shipment in question. Defendant directed that shipments be made up and billed to it, and stated that on receipt of the invoices it would give shipping instructions. For failure of plaintiff to make the earlier shipments on time, defend-

1 F. (2d)—58

ant announced a cancellation of the entire contract, and refused to give further shipping directions. Plaintiff manufactured the entire quantity within the contract time, billed shipments, and sent invoices to defendant, which were returned. *Held*, that plaintiff was not bound to make shipments or tender, in the absence of shipping directions, nor was it bound to bill the exact quantity each week, but that it performed its part of the contract by having the goods ready for shipment each week, after it commenced their manufacture.

**6. Evidence ⟐433(6) — Evidence that party did not read contract before signing held inadmissible.**

A party who executes a contract, in the absence of fraud or mutual mistake, cannot escape liability thereon by saying that he was ignorant of its contents, and evidence that he did not read it is incompetent.

In Error to the District Court of the United States for the Western Division of the Northern District of Ohio; Paul Jones, Judge.

Action at law by the Waxahachie Cotton Mills against the Hettrick Manufacturing Company. Judgment for plaintiff, and defendant brings error. Affirmed.

George P. Hahn and John E. Daniells, both of Toledo, Ohio (Taber & Daniells and Brown, Hahn & Sanger, all of Toledo, Ohio, on the brief), for plaintiff in error.

Robert Newbegin and Charles T. Lewis, Jr., both of Toledo, Ohio (Howard Lewis and Doyle & Lewis, all of Toledo, Ohio, on the brief), for defendant in error.

Before DENISON and DONAHUE, Circuit Judges, and COCHRAN, District Judge.

COCHRAN, District Judge. There is before us here a judgment for plaintiff, in an action to recover damages for breach of contract for the purchase of coarse cotton cloth, known as Osnaburgs, used in the manufacture of bags. It was tried to a jury. Each party, at the close of the evidence, moved for a directed verdict. The court overruled defendant's motion and sustained that of plaintiff. Thereupon a verdict was returned for $22,640.09, upon which the judgment complained of was entered. The errors assigned are the action of the court upon those motions and refusal to permit the introduction of certain evidence offered by defendant.

[1] In disposing of the former, it is not necessary to stress the rule that, if both parties move for a directed verdict, the reviewing court is limited to determining whether there was any substantial evidence on which the trial court could have properly found the facts necessary to support the judgment. Interstate Life Assurance Co. v. Dalton, 165 Fed. 176, 91 C. C. A. 210,

23 L. R. A. (N. S.) 722; Williams v. Vreeland, 250 U. S. 295, 39 Sup. Ct. 438, 63 L. Ed. 989, 3 A. L. R. 1038.

[2] This is so because there was no conflict in the evidence or the inferences to be drawn therefrom. The facts were not in dispute. According thereto the terms of the contract, so far as it is essential to state them, were these:

Defendant purchased from plaintiff 400,-000 yards, 30-inch, 7-ounce, of such cloth, and was to pay therefor 27 cents per yard, subject to price revision by the price-fixing committee of the United States, with an allowance of 3 per cent. discount, if payment was made in 10 days from date of shipment, and 50 cents per hundred on account of freight. Shipments were to be made 10,-000 yards weekly, beginning October 1, 1918, shipping instructions to be given later. Defects in quality or delays in shipment were not to be cause for cancellation of any portion of the contract other than the shipment in question. In case of curtailment, because of any circumstance or cause beyond the reasonable control of plaintiff, deliveries were to be made and accepted in proportion to production available for delivery; and, if the government should require all or a part of the mill production, deliveries might be changed accordingly. The contract was in writing, and, save as to the matter of shipping instructions, was evidenced by a document prepared by plaintiff and signed by both parties. Plaintiff's place of business was at Waxahachie, Tex., and that of defendant at Toledo, Ohio. The contract between them came about through the intervention of T. L. Malone & Co., cotton goods brokers of New York City. The execution of that document was preceded by the passage of telegrams between defendant and Malone & Co., and between Malone & Co. and plaintiff, initiated by defendant. The concluding telegrams were one from Malone & Co. to plaintiff, and one from plaintiff to Malone & Co. Both were sent on July 19, 1918. The former was in these words:

"Telegram, we induced our customer to pay, twenty-seven cents, three ten, fifty cents freight allowance. Sold 400,000 yards, delivery ten thousand yards weekly beginning October first. Wire confirming."

The latter in these:

"Telegram order booked. Thanks."

The previous telegrams showed that the price was subject to revision by the government. On the following day, July 20th, Malone & Co. mailed each party a writing signed by it, designated on its face, "sale note," embodying terms of contract between them. They were the same as those embodied in the telegrams, except there was added that "shipping instructions" were to be given later, and two clauses, one concerning curtailment, substantially the same as that contained in the contract, and the other, claims on the goods. It contained this request:

"If the above is not in accordance with your understanding notify us immediately and confirming by mail."

July 26th plaintiff acknowledged by letter receipt of "sale note covering Osnaburgs sale recently made," and said:

"We are confirming this transaction to Hettrick by mail this date."

This it did and, in its letter, it inclosed the document referred to, which was a communication from it addressed to defendant, dated July 20th. It began:

"We hereby confirm sale made you this date by this company through T. L. Malone & Co., New York, and in accordance therewith have entered your order as follows: [Following which the terms of a contract between them were set forth in detail.]"

At the end was the word "Accepted," with a line for defendant to subscribe its name. This document, as it then was, contained the terms of the contract which have been set forth, except it said nothing as to the price being subject to revision by the government, or as to shipping instructions to be given later, and the discount for prompt payment was put at 2 instead of 3 per cent. In the letter accompanying it, plaintiff said:

"We inclose herein contract covering sale made by T. L. Malone & Co. on the 20th. Kindly confirm this transaction by signing both copies and returning to us. One copy will then be returned to you for your files."

August 9th the plaintiff wired defendant thus:

"We have not received copies of contract mailed you on July twenty-seventh covering sale of four hundred thousand yards seven ounce Osnaburgs. Kindly wire us promptly advising if contract has been signed and forwarded as requested."

On or before August 10th defendant mailed to plaintiff the copies referred to, signed by it as called for; the acceptance being dated July 30th. On the former date defendant wired plaintiff:

"Contract Osnaburgs has been mailed you."

It had inserted therein that the price to be paid was subject to price revision by

the price-fixing committee of the United States. August 14th the plaintiff wrote defendant:

"We are in receipt of one copy of our contract No. 99 which you have signed. We note, however, that you inserted the following clause in connection with the price of this contract, 'subject to revision to price fixing by price-fixing committee of the United States government.' We will accept this clause as a part of this contract, on the condition that, should the government fix the price on 7-ounce Osnaburgs, you will accept government terms; that is, net cash f. o. b. mill, with no freight allowance. Please advise us by return mail if you will accept these terms under the conditions mentioned above."

To this defendant, August 20th, responded:

"We received your letter of the 14th, and wish to advise that, of course, the matter of government terms is included in the price as fixed by the United States government. We understand that in most cases this has been on a basis of net cash in 10 days f. o. b. mill, without any freight allowance."

Plaintiff had not at this time returned to defendant a copy of this document.

On the same day—i. e., August 20th—it wrote plaintiff further, requesting that it "return one signed copy of contract and forwarded to you." August 29th plaintiff wrote defendant:

"We note that you request us to return to you one copy of our contract No. 99. In this connection we wish to advise you that we mailed you two copies of this contract and you returned one. We therefore assume that you have a copy in your files that you have overlooked."

To this, September 6th, defendant answered:

"We have your favor of August 29th, and regret to advise you that we do not have a copy of the contract for 400,000 yards of 7-ounce Osnaburgs. We returned to you all copies you sent us, and, if we only sent you one copy, you sent us only one. We will appreciate it, however, if you will make us another copy, sign same, and return it to us for our files."

September 30th defendant wrote again:

"We are considerably surprised that we have not received from you the copy of our contract for the 400,000 yards of 7-ounce Osnaburgs, as requested in our letter of September 6th. We will certainly appreciate this courtesy by return mail."

October 4th plaintiff wrote:

"We have your favor of the 30th ulto., and, as requested, we inclose duplicate of our contract with you for Osnaburgs. Your previous request for this duplicate contract was simply overlooked, as we have been unusually crowded with work for the past five weeks."

October 9th defendant answered:

"We have your copy of contract for 400,000 yards of 30-inch 7-ounce Osnaburgs, and note you state the terms are 2 per cent. cash. The original order calls for 3 per cent., and will ask that you kindly note this correction."

To this plaintiff replied October 25th:

"We have your favor of the 9th. You are correct. The terms of your contract should be 3 per cent. cash and 10 days from date of shipment, and we have changed your order accordingly. Your letter would have been answered before now, but for the fact that both our office and plant have been practically shut down for the past few weeks, due to influenza."

This ended the communications between the parties as to this document. As changed, it contained all the terms of the contract between the parties heretofore set forth, except that it said nothing as to shipping instructions to be given later.

The defendant, on receipt of the sale note from Malone & Co., also took steps to put the contract of sale between them in writing, signed by both. July 22d it mailed to plaintiff one of its regular order forms, numbered 3762–B, dated as of that date, and signed by it, ordering from plaintiff the goods purchased, and setting forth the terms of contract in relation thereto, as in the telegrams which preceded the "sale note," except that it provided as in the "sale note," that shipping instructions were to be given later, and that the weekly shipments of 10,000 yards were to begin "about October 1st." To this order was attached a stub, to be signed by plaintiff, and detached and returned to defendant.

In defendant's letter of August 20th, heretofore referred to, it had this to say as to this stub:

"Kindly return to us, properly signed, the stub attached to top of our order 3762–B for 400,000 yards of 7-ounce Osnaburgs, as we must have this order to complete our records."

In plaintiff's answer thereto of August 29th, also heretofore referred to, plaintiff said:

"We inclose herein stub to your order No. 3762–B. Since we have sent you our

regular form of contract, we felt it was unnecessary to return this stub."

This order and stub are to be taken in connection with the document whose execution plaintiff brought about, as going to make up the contract between the parties and evidencing the terms thereof. The transaction which resulted in the contract was made up of both. That it was a term of the contract that the defendant was to give shipping instructions later was afterwards recognized by both parties. October 17th defendant mailed to plaintiff shipping instructions as to 13,000 yards. It also gave such instructions as to one bale, either before or after that date. October 26th plaintiff acknowledged receipt of these instructions, and requested defendant to furnish it by return mail "regular shipping instructions in connection with your contract No. 99, 400,000 yards 7-ounce Osnaburgs." October 28th it wrote defendant again, saying:

"We have recently written you asking for shipping instructions on your Osnaburg order. According to our records, you have never furnished us with these instructions."

October 31st defendant, in answer to plaintiff's letter of the 26th, said:

"Your letter of 26th received, acknowledging our instructions on 13,000 yards of 30-inch 7-ounce Osnaburgs. In regard to shipping instructions for the balance, we would suggest that you just make them up and bill them to us, and on receipt of 'invoices we will be able to give you the shipping instructions."

To this plaintiff responded November 4th:

"We thank you for yours of 31st ulto. We will be governed by your instructions, and we will invoice the Osnaburgs due you and hold them at the mill, pending your shipping advice."

November 6th defendant wrote plaintiff, canceling the shipping order for the one bale, and November 9th plaintiff wrote defendant, acknowledging the cancellation.

By virtue of the provision that defects in quality and delays in shipments should not be cause for canceling any portion of the contract other than the shipment in question, there was, in reality, not one entire contract between the parties for 400,000 yards of Osnaburgs, but a divisible contract; i. e., 40 separate contracts for 10,000 yards each. Plaintiff's rights under any of these separate contracts could not be affected by its breach or breaches of any of the others in the matter of the quality of the goods shipped, or in the time of their shipment.

Furthermore, it was a term of the contract that defendant was to give shipping instructions as to each shipment called for, so that there could be no breach on the part of plaintiff in making any shipment at the time called for, unless plaintiff had theretofore received shipping instructions.

The lower court found the contract to be as we have stated it, and was governed by this view thereof in directing a verdict for plaintiff.

The plaintiff did not begin the manufacture of goods under the contract until the early part of December. It claimed to have been prevented from beginning earlier, by reason of the fact that, at the time the contract was entered into, it was under contract with the United States for the manufacture of cotton duck, and it required that contract to be completed before entering upon any other manufacture, and of the further fact that its force was attacked by an epidemic of influenza. According to defendant's order No. 3762–B, the shipments were to begin "about October 1st." It did not give any shipping instructions until October 17th, except possibly as to the one bale, which was subsequently canceled, and then only for 13,000 bales, and, when plaintiff called on it for shipping instructions for the balance of the goods, it directed it to make and bill them to it, and said that on receipt of invoices it would be able to give such instructions. It made no inquiry in relation to what plaintiff was doing in the matter of manufacturing the goods until November 7th, and was led to do so then by plaintiff's delay in shipping the 13,000 yards for which it had given instructions. October 18th, the day after mailing them, it wrote plaintiff:

"We are under impression that invoice for this material should be forthcoming at the present time. Kindly look into this and advise us by return mail."

Plaintiff answered October 21st:

"Replying to yours of 18th, will state that our force is so completely knocked out with influenza that we cannot tell just how soon we can make shipment on your Osnaburg contract, but we will do the best we can and may be able to make you a shipment within the next two weeks."

Defendant replied October 25th:

"Your letter of the 21st received, and note what you have to say in regard to shipment of the 30-inch 7-ounce Osnaburg. We have to advise that we sold the goods for delivery that you sold to us, and we sincerely trust that you will use every ef-

fort possible to make these deliveries as originally agreed upon."

Plaintiff replied in its letter of October 28th:

"Our force has been so completely demoralized by reason of sickness from influenza that we have gotten badly behind with shipment. We have been practically shut down for the past two weeks. However, the epidemic sems to be getting better; prospects are better for a marked improvement during this week. We will soon be in position to make substantial shipments on your order."

This correspondence led defendant to write to plaintiff November 7th:

"Please mail us statement showing kind of material, bale numbers, and yardages of all goods holding for our account, and oblige."

To this plaintiff answered November 13th:

"Replying to yours of the 7th, this is to advice that we have no Osnaburg in stock and we have not set aside any production for your account. However, we will soon be manufacturing these goods in accordance with our contract with you, and we will, in a short time, be making very substantial shipments to your good selves. In the meantime, we ask your indulgence."

November 19th defendant wired plaintiff:

"Our contract with you for 30 in. 7 oz. Osnaburg specified ten thousand yards weekly beginning October 1st. We need the material now, and unless you can ship must buy on open market and charge to you."

November 20th it wired again:

"No answer our wire yesterday so cancel our order 3762-B for 400,000 yards 30 in. 7 oz. Osnaburg."

To this plaintiff answered by wire November 21st:

"Have been endeavoring to purchase one hundred thousand Osnaburgs for shipment contract Number 99. Hence delay answer your wire 19th. Unable to secure goods for prompt delivery. Have been unavoidably delayed in shipments this contract account of commandeering government order —loss in production from influenza epidemic. Such delays provided for in our contract. Now preparing to make shipment—will complete contract within time specified by order. Cannot consider cancellation. Will expect you to accept shipments strictly in accordance signed contract."

A letter to the same effect was written the same day. November 27th defendant wrote plaintiff:

"Your letter of November 22d received; also your telegram of same date, both of which I have carefully noted. Wish to advise you that, in order to prevent cancellation by our customers on order for 30-inch 7-ounce Osnaburg, we were forced, due to your delay in furnishing goods, to secure other material to make delivery to our trade. Furthermore, in your letter of November 13th you stated plainly that you have not set aside any production for us. You failing to respond to our telegram, and we therefore made other arrangements to take care of our customers, and cannot use any more Osnaburg. This order is therefore canceled, and you are requested not to bill us any material on this order."

The plaintiff did not accept this as an anticipatory breach of the contract of purchase, but proceeded to the manufacture of the goods called for by the contract. As stated, it began the early part of December. It completed their manufacture by the first week in July, 1919, the end of the 40 weeks during which they were to be manufactured and shipped. From time to time it billed the goods to the defendant as they were manufactured; defendant returning the invoices to it as received. No invoice covered the exact amount called for in the contract to be shipped weekly, to wit, 10,000 yards. They were generally in excess of that amount; and during several weeks no goods were billed. But the entire amount was billed during the remainder of the 40 weeks, after manufacture began, and the amounts made and billed were always in advance of the amount to be shipped. It was after the lapse of the 40 weeks that this suit was brought and the damages sought to be recovered were the difference between the contract price which had been reduced by the revision of the government to 22¼ cents a yard net cash without freight allowance and proceeds of sale of the goods to others. The lower court did not allow plaintiff damages on account of the entire amount of goods covered by the contract. It eliminated 70,000 yards or seven instalments.

[3] We are now in position to appreciate the grounds upon which the plaintiff in error claims that it and not the defendant in error was entitled to a directed verdict. There are two of them. One is based on the position that the provision in the contract that defects in qualities and delays in shipment should not be cause for canceling any portion thereof other than the shipment in question was not a binding term of the contract, so that it must be treated as in reality an entire contract for 400,000 yards,

and not a divisible one; i. e., 40 separate contracts for 10,000 yards each. It is assumed that, if it so treated, it follows that the direction of the verdict should have been as claimed. The view we have of the matter relieves us of the necessity of considering whether this assumption is sound. That term of the contract is not binding, it is said, because it was without consideration, and the way in which this is attempted to be made out is this. A binding contract had been entered into by the telegrams which passed between Malone & Co. and defendant in error on July 19th, which was confirmed by the sale note of the 20th of Malone & Co., the agent of both parties. It got nothing for consenting to the insertion of this term in the more formal contract, whose execution was brought about by defendant in error. It already had the goods bought without any such term in the contract. The defendant's general position may be stated in its own language. It is this:

"A new agreement by the parties to an older one, changing, modifying, or supplanting their former contract, requires a valid consideration to support it. A modification or change of a contract can be nothing but a new contract, and therefore must be supported by a consideration."

And this:

. "The consideration required to support a new agreement by the parties to an old one by which they modify in one or more particulars their former contract or replace it with a substitute must be reciprocal. Each party must give something. If the benefit is unilateral a consideration is lacking. It is well established that promising to perform that which one is already under a legal obligation by contract to do is no consideration for another contract and such a contract is nudum pactum and void."

It cites in support of this position the decisions in the cases of Thurston & Hays v. Ludwig, 6 Ohio St. 1, 67 Am. Dec. 328; Turnbull v. Brock, 31 Ohio St. 649; Alaska Packers' Ass'n v. Domenico, 117 Fed. 99, 54 C. C. A. 485; Empire State Surety Co. v. Hanson, 184 Fed. 58, 107 C. C. A. 1.

In Thurston & Hays v. Ludwig, there was a written contract of purchase of hogs to be paid for on delivery. The purchaser, after the execution of the contract, promised verbally to make an advancement on the purchase price a month before the time of delivery. This promise was held not binding. In Turnbull v. Brock, it was held that part payment of a debt already due is not a sufficient consideration of an agreement

to extend the time for the payment of the residue. In Alaska Packers' Ass'n v. Domenico, parties were under contract to render another services for certain pay. They refused to work. Upon the hirer's promise to pay more, they agreed to work. It was held that the promise was not binding. In Empire State Surety Co. v. Hanson, it was held that a promise by the owners of buildings under construction to extend the time of their completion beyond that fixed by the contract, on the promise of the contractor to have them completed within a further time stated, was not binding as without consideration. We do not find it necessary to consider how far these authorities go to support the position stated, or its soundness. It is questionable whether defendant was in position to raise any such question under the pleadings. The petition alleged the contract to be, as we have held it to be, and that it was evidenced by the sale note, defendant's order of July 22d, and the writing of plaintiff dated July 20th, and accepted by defendant July 30th. The answer denied the making of any such contract, or that it was so evidenced, and alleged affirmatively that the contract was as evidenced by the telegrams, all of which were set forth in full, which was confirmed by the sale note of T. L. Malone & Co. of July 20th, and its order of July 22d, and by reason of plaintiff's breach of the contract as thus evidenced it was not bound thereby. It did not admit the making of the contract as alleged by plaintiff, and claim that before its making they had entered into a binding contract through the telegrams and sale note, and that therefore its agreement that the contract might be in reality 40 separate contracts for 10,000 yards each, instead of one entire contract for 400,000 yards, was without consideration and not binding upon it.

The sole question raised by the answer was whether such a contract as plaintiff claimed had been in fact entered into, or whether the only contract which had been in fact entered into was that claimed by defendant. But this need not be stressed. The authorities cited have no bearing here. In each of those cases a binding contract had been entered into and subsequent thereto one of the parties promised, without additional consideration, to do something more than that which he was bound to do. Here in the minds of the parties no binding contract had been entered into prior to the execution of the documents prepared by them, respectively, and signed by both.

What had transpired before was looked upon as mere negotiations, having in view the entering into a contract. They so treated them. The sale note contained terms not in the telegrams, and called on the parties to notify Malone & Co. immediately, if the terms therein were not in accordance with their understanding, and to confirm by mail. These prior negotiations were merged in those documents, and it was provided in that prepared by plaintiff that "all understandings and agreements are embodied therein." In the contemplation of the parties, the execution of those documents did not constitute an amendment of or addition to a prior existing contract, but they constituted the only contract which they had entered into. No other view of the transaction can now be taken.

[4] The other ground relied on is based on an acceptance of the contract between the parties as not an entire one for 400,000 yards, but 40 separate ones for 10,000 yards each. The plaintiff in error urges that there was no anticipatory breach on its part, or, if there was, defendant in error did not accept it and sue upon it, but sued as if there had been no such breach; i. e., for breach of performance on its part at the time it was due. This being so, in order to put it in default defendant in error must have performed its part of the contract, so far as necessary to put it in default. This it claims defendant in error did not do, and for this reason it, and not defendant in error, was entitled to the directed verdict.

The claim that plaintiff in error was not guilty of an anticipatory breach is based on the construction of its telegram of November 20th, as not a renunciation of the contract, but a mere request to cancel, which defendant in error refused to grant in its telegram and letter of November 21st. This may be a true construction thereof. But by its letter of November 27th plaintiff in error did renounce the contract. It said that it was canceled and requested defendant in error not to bill or ship the goods to it, which was a polite way of saying that it would not receive them or pay for them, if it did.

But it is true that defendant in error did not accept this anticipatory breach of the contract and sue upon it. It sued for the breach by plaintiff in error of its obligations at the time when they were due to be performed. And it follows from this that, in order to recover, it was essential for defendant in error to allege and prove performance on its part, so far as necessary to put

plaintiff in error in default. The authorities cited by it sustain this contention. In the case of Foss–Schneider Brewing Co. v. Bullock, 59 Fed. 83, 8 C. C. A. 14, the matter is put thus:

"It is true that, where a contracting party gives notice of his intention not to comply with the obligation of his contract, the other contracting party may accept this as an anticipatory breach of the contract, and sue for damages without waiting until the time mentioned for the completion and fulfillment of the contract by its terms; but, in order to enable the latter to sue on such an anticipatory breach, he must accept it as such, and consider the contract at an end. If he elects to consider the contract still in force, he cannot recover thereafter without performing all the conditions of the contract by him to be performed."

In Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, quoting from Frost v. Knight, L. R. 7 Exch. 111, it is put thus:

"The promisee, if he pleases, may treat the notice of intention as inoperative, and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of nonperformance; but in that case he keeps the contract alive for the benefit of the other party, as well as his own. He remains subject to all his own obligations and liabilities under it, and enables the other party not only to complete the contract, if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstance which would justify him in declining to complete it."

See Vogt Bros. M. Co. v. Sloss-Sheffield Steel & Iron Co. (C. C. A.) 297 Fed. 54–56, 57, 58, 59.

[5] The question we have here, then, is this: Did defendant in error perform all the conditions to be performed by it, and whose performance was essential to put plaintiff in error in default; i. e., to bring about a breach on its part? It is the claim of plaintiff in error that it did not.

Its position does not seem to be that, in order to bring about a breach on part of the plaintiff in error, it was necessary for defendant in error to actually ship the goods; i. e., to deliver them to the carrier at Waxahachie. Of course, if that was so, it was necessary for it to deliver each week that plaintiff in error was to be held the exact quantity called for—no more and no less. In the case of Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366, it is said:

"The seller is bound to deliver the quantity stipulated."

The defendant in error did not do this any week during the time covered by the contract. It made no shipment of any quantity at any time under the contract. The plaintiff in error's position seems to be that defendant in error was bound each week to tender plaintiff in error the exact quantity called for. It proceeds upon the idea that what defendant in error was bound to do, in order to bring about a breach on plaintiff in error's part, was unaffected by its renunciation; i. e.; its statement that it would not accept or pay for goods under the contract. As the law does not require any one to do vain or useless things, ordinarily a formal tender is never required, where it appears that, if it had been made, it would not have been accepted. If plaintiff adhered to what it had said, it would have been a vain or useless thing for defendant to have shipped or tendered the goods under the contract. But we pass this by, assuming that this idea is sound. And, before considering whether a tender of the exact quantity called for each week was necessary, it is well to see how it stands in the matter of making shipments; i. e., delivering to the carrier at Waxahachie for plaintiff in error such quantity weekly. Was defendant in error bound to make such shipments to bring about a breach on plaintiff in error's part? It was not, and this because it was impossible for it to make shipments as called for, without certain precedent action on the part of the plaintiff in error, and it never took such action. The shipments were to be as plaintiff in error instructed them to be made. The goods were purchased largely, if not entirely, for resale. It was therefore uncertain whereto it would desire to have the goods shipped. The one bale as to which the directions for shipment was canceled had been ordered shipped to Kerr-Bleachey at some place not given in the record. The giving of such instructions was a condition precedent to defendants in error's obligation to ship, and also an obligation on the part of the plaintiff in error.

In Williston on Sales, § 457, in speaking of the subject of notice, it is said:

"Generally where the buyer or seller is entitled to notice before performing, the notice is not simply a condition qualifying his obligation, but it is also a legal duty of the other party to give such notice within a reasonable time. Accordingly, if the notice is not given, not simply is the party who should receive it excused from performing but he has a right of action against the party who should perform it."

In the case of Louisville, N. A. & C. Ry. Co. v. Diamond, 126 Ill. 294, 18 N. E. 735, it was held that the seller's right to recover on a contract for the sale of goods to be delivered at his mill, and to be shipped "about" certain times, shipping directions to be given by the buyer, is not affected by his failure to ship, if shipping directions are not given.

In 2 Mechem on Sales, p. 974, § 1130, it is said:

"Where the goods are to be delivered when the buyer gives notice of his readiness to receive them, or gives shipping directions, the buyer is bound to act within a reasonable time, and his failure to do so will exonerate the seller from the necessity of doing that; e. g., shipping the goods, which was to be done when the buyer had so acted."

It is no doubt in recognition of this that plaintiff in error, as it seems, does not claim that defendant in error was bound to ship— i. e., deliver to the carrier at Waxahachie for plaintiff in error—10,000 yards each week, and only claims that he was bound to make a tender of such amount of goods each week, and, because it did not do so, was not entitled to recover. But any tender, in the legal sense of that word, was out of the question. The plaintiff in error was not at Waxahachie, the place of delivery, so that tender could not be made there, and defendant in error was not bound to take the goods to Ohio and there tender them to plaintiff in error. No doubt what is meant —i. e., all that could be meant—is that defendant in error was bound each week to notify plaintiff in error that it was ready and willing to ship the stipulated quantity, upon receiving shipping instructions, or to bill that quantity of goods to it. But it was under no such obligation. All that was essential for it to do was to be ready and willing to make shipment of such quantity, on receipt of shipping instructions. In Williston on Sales, p. 770, it is said:

"Where, by the terms of the contract, the defendant has not performed some condition precedent, it is enough for the plaintiff to allege that he was ready and willing. He need do nothing actively until the defendant has performed the prior obligation."

The defendant in error, after it began the manufacture of the goods in the early part of December, manufactured enough to be able to ship 10,000 yards each week thereafter. The defendant in error was not un-

der obligation each week to manufacture this quantity, and this only, or to bill it to plaintiff in error or inform it of its readiness and willingness to ship it on receiving shipping instructions. All that it was bound to do was to be ready and willing each week to ship that quantity on receiving such instructions, and that it was. It always had more goods on hand than were needed to enable it to fulfill its contract with plaintiff in error.

But, apart from this, the position here under consideration is not well taken. In response to defendant in error's letter of October 26th, by which it acknowledged receipt of the shipping instructions for the 13,000 yards and requested shipping instructions for the balance of the goods, plaintiff in error, by its letter of October 31st, said to defendant in error to make up and bill the balance, and on receipt of invoices it would be able to give shipping instructions. The defendant in error did just what it had thus been told to do, but no shipping instructions were given. Thereafter defendant in error was not bound to make any shipments, however it may have been otherwise. Nor in billing the goods was it called on to bill only 10,000 yards weekly. If it made up the goods sufficient to meet a call for 10,000 yards weekly, and billed them as it made them up, it complied with what it was requested to do. That plaintiff in error was not concerned about the weekly quantity called for, appears from the fact that neither of the shipping instructions given by it called for that amount, one being for one bale and the other for 13,000 yards.

We therefore conclude that the defendant in error and not the plaintiff in error was entitled to the directed verdict. Whether the former was entitled to a directed verdict for the full amount for which it was rendered is not raised or argued before us.

[6] It remains to consider the other error assigned. The acceptance of the document prepared by defendant in error was made by plaintiff in error's general manager, Tische. The additional terms embraced thereby were in print. The plaintiff in error offered to prove by him that, when he signed it, he read the first part of it, which stated that it was confirming the sale note of Malone & Co. and that he then checked it against that note and finding that it compared with all of the terms thereof, he signed it without reading further the printed matter at the bottom. The lower court refused to allow him to so testify. We think this ruling was correct.

The plaintiff in error had both copies in its possession. It inserted in both the clause as to the price being subject to revision, and returned them to defendant in error. On the return to it of its copy it took note that the discount rate was 2 per cent. instead of 3 per cent. as it should have been and had it corrected and thereafter retained its copy without complaint. A party who executes a contract, in the absence of fraud or mutual mistake, cannot say that he was ignorant of its contents and thus escape liability.

Judgment affirmed.