**HARTE–HANKS DIRECT MARKETING/BALTIMORE, INC.**

v.

**VARILEASE TECHNOLOGY FINANCE GROUP, INC.,
et al.**

No. CIV. CCB–03–2775.

United States District Court,
D. Maryland.

Jan. 28, 2004.

506

508

one as to defendants Varilease Technology Group, Inc., Worldwide Maintenance Company, and Varilease Technology Finance Group, Inc., (5) dismiss all other claims against Varilease Technology Group, Inc. and Worldwide Maintenance Company for failure to state a claim, with leave to amend count six, and (6) dismiss all other claims against Varilease Technology Finance Group, Inc. for failure to state a claim.

John Allen McCahill and Steven Lieberman, Rothwell Figg Ernst and Manbeck PC, Washington, DC; Charles Platto, Law Offices of Charles Platto PLC, Norwich, VT, for Plaintiff.

Price O. Gielen, Neuberger Quinn Gielen Rubin and Gibber PA, Edward Hutchinson Robbins, Jr., and John Robert Fischel, Miles and Stockbridge PC, Baltimore, MD, for Defendants.

## MEMORANDUM

BLAKE, District Judge.

Now pending before the court are motions filed by the defendants to dismiss all of the plaintiff's claims on various grounds, and a motion filed by the plaintiff for a preliminary injunction. For the reasons stated below, the court will (1) dismiss all claims against defendant Robert VanHellemont for lack of personal jurisdiction, (2) dismiss all claims against MVSS International, LLC for failure to state a claim, (3) dismiss all claims against CitiCapital Commercial Leasing Corporation for failure to state a claim, with leave to amend count seven, (4) deny the motion to dismiss count

## BACKGROUND

Plaintiff Harte–Hanks Direct/Marketing Baltimore, Inc. ("Harte–Hanks Baltimore") is a direct marketing company with its principal place of business in Baltimore, Maryland, and is a Maryland corporation. Harte–Hanks Baltimore is a subsidiary of Harte–Hanks, Inc. ("Harte–Hanks National"), a corporation with its principal place of business in San Antonio, Texas, and with affiliated offices in a dozen other states and around the world. Harte–Hanks Baltimore's claims arise from a Master Lease Agreement ("MLA") entered into on June 22, 2001 by Harte–Hanks National and Varilease Technology Group, Inc., an Arizona corporation ("Varilease Arizona").[1] Under the MLA, Harte–Hanks National agreed to lease sophisticated laser printers from Varilease Arizona for a period of 48 months, at a base monthly rental rate of over $59,000. (Compl. at Ex. 1, MLA, at Sched. 01 and 02, at ¶ 2.) The MLA specifies that the equipment is to be located at 4545 Annapolis Road, Baltimore, Maryland, which is the location of Harte–Hanks Baltimore. (Id. at ¶ 3.) Other than the listing of this address, the MLA contains no references to Harte–Hanks Baltimore.

1. According to the plaintiff's complaint, Varilease Arizona has registered a name change with the Arizona Corporation Commission, and is now known as Worldwide Maintenance Company. (Compl. at ¶ 8–9.) Both entities will be referred to collectively as "Varilease Arizona" in this memorandum.

On October 19, 2001, Varilease Arizona sent a Notice and Acknowledgment directed to Harte–Hanks National at the Baltimore address, providing notice that Varilease Arizona had granted a security interest for financing purposes in a portion of the MLA to Associates Leasing, Inc., a corporation now known as CitiCapital Commercial Leasing Corporation ("CitiCapital").[2] (*Id.* at ¶ 19, Ex. 2.) On December 17, 2001, Varilease Arizona sent an identical Notice and Acknowledgment directed to Harte–Hanks National at the Baltimore address, providing notice that it had granted a security interest in the remainder of the MLA to CitiCapital. (*Id.* at Ex. 3.) On November 15, 2002, Varilease Arizona sent a Notice and Acknowledgment directed to Harte–Hanks National at the Baltimore address, providing notice that Varilease Arizona had sold and assigned all of its rights and obligations under the MLA to Varilease Technology Finance Group, Inc., a Michigan corporation ("Varilease Michigan"). (*Id.* at Ex. 4.) According to the plaintiff's complaint, Varilease Michigan now claims that this assignment was in error, and that Varilease Michigan has not assumed any responsibilities under the MLA. (*Id.* at ¶ 29.)

Harte–Hanks Baltimore alleges that the printing equipment leased from Varilease Arizona requires daily, on-site maintenance. (*Id.* at ¶ 13.) The schedules to the MLA state that "[b]ase maintenance is included in the Base Monthly Rental for all of the leased equipment," and that the lessee is entitled to a certain number of "usage clicks" per month at no additional charge. (*Id.* at Ex. 1, MLA, at Sched. 01 and 02, at ¶ 7(1) and (2).) Harte–Hanks Baltimore alleges that a separate maintenance agreement was to be arranged by the lessor, and that the basic costs for this maintenance are included in the base monthly rent paid to the lessor. (*Id.* at ¶ 14.) Harte–Hanks Baltimore estimates that the value of the base maintenance included in the MLA is approximately $34,000 per month, or more than half of the monthly rental fee.[3] (*Id.* at ¶ 13.) Harte–Hanks Baltimore also states that it has made timely monthly payments of over $59,000 to either Varilease Arizona or Citi-Capital throughout the term of the MLA. (*Id.* at ¶ 31, 39.)

According to the complaint, Varilease Arizona provided daily, on-site maintenance for the leased equipment through January 2003, even after the MLA apparently had been assigned to Varilease Michigan. (*Id.* at ¶ 32–33.) In January 2003, a company named MVSS International, LLC ("MVSS") informed Harte–Hanks Baltimore that it would be taking over the maintenance obligation from Varilease Arizona from that point forward. (*Id.* at ¶ 33.) However, the same maintenance personnel continued to perform the work. (*Id.*) In May 2003, MVSS informed Harte–Hanks Baltimore that it would continue to perform the maintenance work only if Harte–Hanks Baltimore made additional payments to MVSS, which Harte–Hanks Baltimore refused to do. (*Id.* at ¶ 35.) Around July 1, 2003, MVSS and Varilease Michigan informed Harte–Hanks Baltimore that they were losing money on the maintenance services, and no longer would perform the work. (*Id.* at ¶ 37.) Harte–

---

2. Under the terms of the MLA, Harte–Hanks National had consented to all future assignments of Varilease Arizona's right, title, and interest in and to the lease and the equipment. (Compl. at Ex. 1, MLA, at ¶ 10(a).)

3. This estimate is based on the language in the schedules entitling the lessee to a certain number of "usage clicks" per month at no additional charge. (Compl. at Ex. 1, MLA, at Sched. 01 and 02, at ¶ 7(2).)

Hanks Baltimore alleges that, as a result, it has been required to arrange for a new maintenance agreement with another company at an additional cost of over $40,000 per month. (*Id.* at ¶ 38.)

The laser printers leased by Varilease Arizona each display a meter that is designed to count the number of copies printed during the life of the machine. (*Id.* at ¶ 16.) Harte–Hanks Baltimore also alleges that although the meters on the laser printers indicate that the machines had limited prior service, the meters have been altered and the machines actually have substantially more prior service than indicated. (*Id.* at ¶ 17–18.)

Harte–Hanks Baltimore filed this suit on September 29, 2003 against Varilease Michigan, MVSS, Varilease Arizona, Citi-Capital, and Robert VanHellemont.[4] The complaint includes counts for breach of contract, breach of the implied covenant of good faith and fair dealing, quantum meruit / unjust enrichment, estoppel, and fraud. (*Id.* at ¶ 40–68.) The plaintiff also seeks a declaratory judgment regarding the parties' rights and legal obligations, and injunctive relief enjoining CitiCapital and the other defendants from repossessing the leased equipment and from requiring further lease payments from Harte–Hanks Baltimore. (*Id.* at ¶ 69–74.) The plaintiff requests rescission of the MLA, damages, and punitive damages against all of the defendants except CitiCapital.

## ANALYSIS

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir.1999) (internal quotation marks and alterations omitted). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States,* 120 F.3d 472, 474 (4th Cir.1997). Consequently, a motion to dismiss under Rule 12(b)(6) may be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Edwards,* 178 F.3d at 244. In addition, because the court is testing the legal sufficiency of the claims, the court is not bound by the plaintiff's legal conclusions. *See, e.g., Young v. City of Mount Ranier,* 238 F.3d 567, 577 (4th Cir.2001) (noting that the "presence ... of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6)" when the facts alleged do not support the legal conclusions); *Labram v. Havel,* 43 F.3d 918, 921 (4th Cir.1995) (affirming Rule 12(b)(6) dismissal with prejudice because the plaintiff's alleged facts failed to support her conclusion that the defendant owed her a fiduciary duty at common law).

## I. Personal Jurisdiction over Robert VanHellemont

Defendant Robert VanHellemont has filed a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(2), arguing that the court cannot assert personal jurisdiction over him. When a defendant challenges a court's personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Pro-

---

4. According to the plaintiff's complaint, VanHellemont is Chief Executive Officer of Varilease Michigan, majority owner of both Varilease Michigan and MVSS, and was an officer, employee, and director of Varilease Arizona until January 2002. (Compl. at ¶ 10.)

cedure, the burden rests ultimately with the plaintiff to prove, by a preponderance of the evidence, grounds for jurisdiction. *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396–97 (4th Cir.2003). If the district court does not hold an evidentiary hearing, however, as in this case, then the plaintiff is required only to make a prima facie showing of personal jurisdiction. *See id.* at 396; *Estate of Bank v. Swiss Valley Farms Co.*, 286 F.Supp.2d 514, 516 (D.Md.2003). The court must resolve all factual disputes and make all reasonable inferences in favor of the plaintiff. *See Carefirst*, 334 F.3d at 396.

A federal court may exercise personal jurisdiction over a nonresident defendant if (1) jurisdiction is authorized under the long-arm statute of the forum state, and (2) the assertion of jurisdiction comports with Fourteenth Amendment due process requirements. *See Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir.2001). The Maryland Court of Appeals has held that Maryland's long-arm statute is co-extensive with the scope of jurisdiction permitted by the due process clause of the Fourteenth Amendment, and the statutory and constitutional inquiries therefore merge in this case. *See Carefirst*, 334 F.3d at 396–97. The Maryland long-arm statute, however, limits specific jurisdiction to cases where the cause of action "aris[es] from any act enumerated" in the statute itself. Md.Code Ann., Cts. & Jud. Proc. § 6–103(b)(1). Thus, a plaintiff must "identify a specific Maryland statutory provision authorizing jurisdiction." *Ottenheimer Publishers, Inc. v. Playmore, Inc.*, 158 F.Supp.2d 649, 652 (D.Md.2001); *see also Joseph M. Coleman & Assoc., Ltd. v. Colonial Metals*, 887 F.Supp. 116, 118–19, n. 2 (D.Md.1995). Harte–Hanks Baltimore relies on a provision of Maryland's long-arm statute which confers personal juris-

diction over a corporation that "transacts any business" in the state. Md.Code Ann., Cts. & Jud. Proc. § 6–103(b)(1).

■ The nature of the claim and the defendant's contacts with the forum state determine whether a court may assert specific or general personal jurisdiction. Specific jurisdiction may exist where the claim is related to or arises out of the defendant's contacts with the state. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Christian Sci. Bd. of Dirs.*, 259 F.3d at 215–16. Harte–Hanks Baltimore asserts that the court has specific jurisdiction over VanHellemont, because the plaintiff's claims related to the MLA arise out of VanHellemont's contacts with the state. To determine whether the exercise of specific jurisdiction comports with due process, the court must consider "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Carefirst*, 334 F.3d at 397 (internal quotation omitted). A defendant has purposely availed himself of the privilege of conducting business in the forum state if the defendant has created a "substantial connection" to the forum. *Ellicott Mach. Corp., Inc. v. John Holland Party Ltd.*, 995 F.2d 474, 477 (4th Cir.1993). In evaluating whether the exercise of jurisdiction is "constitutionally reasonable," the courts may weigh "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental

substantive social policies." *Christian Science Bd. of Dirs.*, 259 F.3d at 217 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

■ In its complaint, Harte–Hanks Baltimore alleges that VanHellemont is the majority owner of Varilease Michigan and MVSS, an officer of MVSS, and a former officer, director and employee of Varilease Arizona (Compl. at ¶ 10), and that the leased equipment "apparently is still owned or controlled by VanHellemont or Varilease Michigan" (*id.* at ¶ 37). An affidavit filed by Lin Wells, Managing Director of Harte–Hanks Baltimore, asserts the following additional facts: (1) VanHellemont participated in a telephone call with representatives of Harte–Hanks Baltimore on or about June 24, 2003, in which he stated that he personally owned the leased equipment (Pl.'s Opp. Mem. re: Varilease Defs. & VanHellemont, at Ex. 1, Wells Aff., at ¶ 6), and (2) it is believed that VanHellemont was directly or indirectly involved with negotiations regarding the MLA and with subsequent transactions related to the MLA (*id.* at ¶ 7–8, 11).[5] In sum, Harte–Hanks Baltimore bases its claim for personal jurisdiction over VanHellemont on his position as an officer of Varilease Arizona and MVSS and an owner of Varilease Michigan and MVSS, his involvement in the MLA and subsequent related transactions, and his ownership of the leased equipment.

In response, VanHellemont has filed an affidavit asserting the following facts: (1) he is a resident of Florida, and has been to Maryland only once during the past ten years to visit a personal friend (Def. Van-Hellemont's Mem. at Ex. 1, VanHellemont Aff., at ¶ 3, 6), and (2) he has not personally transacted any business in Maryland, either directly or through an agent (*id.* at ¶ 4–5). VanHellemont also states that (1) he did not personally participate in the MLA transaction, other than advising the president of Varilease Arizona on how to price the transaction (Def. VanHellemont's Reply at Ex. 1, VanHellemont Aff., at ¶ 6), (2) he has never owned the equipment leased to Harte–Hanks Baltimore (*id.*), and (3) he made the statement in the summer of 2003 that he "probably" owned the leased equipment because he has loaned over $2,000,000 to Varilease Arizona, which is secured by that company's assets, including the leased equipment (*id.* at ¶ 5, 7).

VanHellemont's status as an officer, director, employee and owner of several of the defendant corporations involved in the MLA and related transactions is not sufficient—standing alone—to confer personal jurisdiction over him individually. Personal jurisdiction over an individual officer, director, or employee of a corporation does not automatically follow from personal jurisdiction over the corporation. *See Rhee Bros., Inc. v. Han Ah Reum Corp.*, 178 F.Supp.2d 525, 532 (D.Md.2001); *Mates v. N. Am. Vaccine, Inc.*, 53 F.Supp.2d 814, 821 (D.Md.1999); *Quinn v. Bowmar Publ'g Co.*, 445 F.Supp. 780, 785 (D.Md. 1978). Likewise, jurisdiction over a shareholder of a corporation cannot be predicated on jurisdiction over the corporation. *See Marriott PLP Corp. v. Tuschman*, 904 F.Supp. 461, 466 (D.Md.1995). Personal jurisdiction must be based on an individual's personal contacts with or purposeful

---

5. The plaintiff properly does not rely on the June 24, 2003 phone conversation itself as a sufficient contact to confer personal jurisdiction. Phone calls or correspondence to Maryland from out-of-state generally are not sufficient, standing alone, to confer personal jurisdiction. *See Ritz Camera Ctrs., Inc. v. Wentling Camera Shops, Inc.*, 982 F.Supp. 350, 354 (D.Md.1997); *Cape v. von Maur*, 932 F.Supp. 124, 128 (D.Md.1996).

availment of the forum state. *See Quinn*, 445 F.Supp. at 785; *see also Calder v. Jones*, 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) ("Each defendant's contacts with the forum State must be assessed individually."). For this reason, the Fourth Circuit has stated that a federal court may not exercise personal jurisdiction over a corporation's agent if the agent's only connection to the forum state is as an officer or employee of a nonresident corporation that committed a tort in the state, and if the agent's own involvement in that tort occurred outside of the forum state. *See Columbia Briargate Co. v. First Nat'l Bank in Dallas*, 713 F.2d 1052, 1060–61 (4th Cir.1983).[6] Personal jurisdiction in this case must be based on VanHellemont's personal contacts with the state of Maryland, not his status as an officer, director, employee, and owner of several of the defendant corporations.

■■■ In the alternative, Harte–Hanks Baltimore suggests that the court should pierce the corporate veil to establish personal jurisdiction over VanHellemont. Under Maryland law,[7] the court may pierce the corporate veil for jurisdictional purposes if the circumstances would allow piercing of the corporate veil generally. *See Birrane v. Master Collectors, Inc.*, 738 F.Supp. 167, 169–70 (D.Md.1990) (declining to pierce the corporate veil to establish personal jurisdiction over the principal of a corporation); *Quinn v. Bowmar Publ'g Co.*, 445 F.Supp. 780, 786–87 (D.Md.1978) (same). The Maryland courts

will pierce the corporate veil only where necessary to prevent fraud or to enforce a paramount equity. *See Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md.App. 294, 728 A.2d 783, 789 (1999). Among the factors to be considered in determining whether the corporate veil must be pierced to enforce a paramount equity are gross undercapitalization of the corporation, a dominant shareholder's siphoning of corporate funds, the absence of corporate records, or other indicators that the corporation is merely a facade for the shareholder's operations. *See id.* The party seeking to pierce the corporate veil bears the burden of proof. *See Turner v. Turner*, 147 Md. App. 350, 809 A.2d 18, 62 (2002). Maryland generally is more restrictive than other jurisdictions in allowing a plaintiff to pierce the corporate veil. *See Residential Warranty*, 728 A.2d at 790–91; *see also Bart Arconti & Sons, Inc. v. Ames–Ennis, Inc.*, 275 Md. 295, 340 A.2d 225, 234–35 (1975) (declining to pierce the corporate veil, even though the principals transferred assets of the corporation and rendered it insolvent for the purpose of evading its legal obligations).

■■■ Harte–Hanks Baltimore has failed to establish that the corporate veil must be pierced in this case to prevent fraud or to enforce a paramount equity. Although Harte–Hanks Baltimore alleges two counts of fraud, neither of these claims are causally related to the relationship between VanHellemont and the various corporate

---

**6.** On the other hand, a court may assert personal jurisdiction where the defendant is the officer or director of a corporation based in the forum state, *see Pittsburgh Terminal Corp. v. Mid Allegheny Corp.*, 831 F.2d 522, 527–29 (4th Cir.1987), or where an officer, director, or employee personally commits a tort in the forum state, *see Columbia Briargate*, 713 F.2d at 1060–61. In these situations the individual's personal contacts with and purposeful

availment of the forum state provide the basis for personal jurisdiction.

**7.** The law of the forum state determines whether the corporate veil should be pierced for purposes of establishing personal jurisdiction. *See Burns & Russell Co. of Baltimore v. Oldcastle, Inc.*, 198 F.Supp.2d 687, 697 (D.Md.2002).

entities, and neither allege any personal involvement by VanHellemont in the allegedly false representations.[8] Only if VanHellemont had used the corporate entities to perpetrate a fraud against Harte–Hanks Baltimore would piercing the corporate veil be necessary to prevent such fraud, a condition that the plaintiff's allegations do not support. *See Antigua Condo. Ass'n v. Melba Investors Atl., Inc.*, 307 Md. 700, 517 A.2d 75, 93 (1986) (stating that to pierce the corporate veil the plaintiffs would need to show that the defendant's use of the corporate entity worked a fraud against them).[9] Piercing the corporate veil also is not necessary in this case to enforce a paramount equity. There are no allegations to suggest that Varilease Arizona, Varilease Michigan, or MVSS were grossly undercapitalized or merely shell corporations or facades for VanHellemont's personal operations, or that VanHellemont siphoned corporate funds from these entities. *See Residential Warranty*, 728 A.2d at 789. According to facts alleged by VanHellemont, and undisputed by the plaintiff, Varilease Arizona had officers and approximately 100 employees, maintained audited financial statements for every year through 2001, and was capitalized in part with loans of millions of dollars from VanHellemont himself. (Def. VanHellemont's Reply at Ex. 1, VanHellemont Aff., at ¶ 3–5.)

VanHellemont's alleged involvement in the negotiation of the MLA and subsequent transactions related to the MLA also is not sufficient to confer personal jurisdiction in this case. Neither the plaintiff's complaint nor Lin Wells's affidavit points to any specific contacts that VanHellemont personally had with Maryland related to these transactions, or any specific role that VanHellemont played in the transactions.[10] VanHellemont admits very limited involvement in the MLA, denies any involvement in the subsequent transactions, and states that he never was physically present in Maryland and has not transacted any business in Maryland. (Def. VanHellemont's Mem. at Ex. 1, VanHellemont Aff., at ¶ 6; Def. VanHellemont's Reply at Ex. 1, VanHellemont Aff., at ¶ 4, 6.) Resolving all factual disputes and making all reasonable inferences in favor of the plaintiff, it appears that any personal involvement by VanHellemont in the MLA and related transactions occurred outside of Maryland and did not involve any direct contacts with Maryland. Under these circumstances, the plaintiff has failed to establish even a prima facie case that VanHellemont purposefully availed himself of the privilege of conducting activities in Maryland, such that the exercise of jurisdiction would be constitutionally reasonable. *Cf. Christian Book Distribs., Inc. v. Great Christian Books, Inc.*, 137 Md.App.

---

8. There is no suggestion that VanHellemont was involved in the initial, allegedly false representation that the MLA had been assigned to Varilease Michigan, which forms the basis for count five, although Harte–Hanks Baltimore does allege that VanHellemont subsequently has denied the validity of this assignment. (*See* Compl. at ¶ 29, 62–64.)

9. In any event, as discussed *infra*, the plaintiff has failed to properly allege specific facts indicating fraud by any of the defendants, which also is required to establish grounds for piercing the corporate veil based on fraud.

*See Antigua Condominium Ass'n*, 517 A.2d at 93.

10. Wells states in very general terms that VanHellemont was involved in these transactions, based on "information and belief" rather than Wells's personal knowledge. (Pl.'s Opp. Mem. re: Varilease Defs. & VanHellemont at Ex. 1, Wells Aff., at ¶ 7–8, 11.) The court need not accept such "conclusory factual allegations devoid of any reference to actual events." *Baltimore–Clark v. Kinko's, Inc.*, 270 F.Supp.2d 695, 698 (D.Md.2003) (internal citation omitted).

367, 768 A.2d 719, 734–35 (2001) (finding that it would violate due process to exercise jurisdiction over a corporate agent who had negotiated a contract with a corporation based in the forum state, where the agent never had been physically present in the forum state, had limited contacts with the other corporation, and was acting solely in his corporate capacity).

Finally, VanHellemont's alleged ownership of the leased equipment is not sufficient to confer personal jurisdiction. Although the plaintiff states in its memorandum that VanHellemont personally owns the equipment leased to Harte–Hanks Baltimore (Pl.'s Opp. Mem. re: Varilease Defs. & VanHellemont, at 20, 22, 23), the evidence in the record is not so clear. The complaint merely alleges that the equipment "apparently is still owned or controlled by VanHellemont or Varilease Michigan" (Compl. at ¶ 37), and Lin Wells's affidavit points to a statement by VanHellemont that he personally owns the equipment (Pl.'s Opp. Mem. re: Varilease Defs. and VanHellemont at Ex. 1, Wells Aff., at ¶ 6). VanHellemont denies that he has ever owned the leased equipment, and explains that his statement to Harte–Hanks Baltimore that he "probably" owns the equipment was based on a security interest that he now holds in all of Varilease Arizona's assets. (Def. VanHellemont's Reply at Ex. 1, VanHellemont Aff., at ¶ 5–7.) Resolving all factual disputes and making all reasonable inferences in favor of the plaintiff, the evidence and allegations only establish that VanHellemont has acquired a security interest in the leased equipment.

■ Even assuming that VanHellemont held a security interest in the leased equipment from the beginning of the MLA,[11] this fact standing alone is insufficient to confer personal jurisdiction. In other cases where federal courts have rested personal jurisdiction in part on the defendant's possession of a security interest in property located in the forum state, the defendant had filed a security interest in the forum state itself and had other contacts with the forum state. *See National Can Corp. v. K Beverage Co.*, 674 F.2d 1134, 1137 (6th Cir.1982); *Kyle v. Cont'l Capital Corp.*, 575 F.Supp. 616, 621 (E.D.Pa.1983); *Fin. Co. of Am. v. BankAmerica Corp.*, 493 F.Supp. 895, 901–02 (D.Md.1980); *see also Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1296 (10th Cir.1999) (holding that the defendant's filing of security interests in the forum state was insufficient to confer general jurisdiction). The plaintiff has not alleged that VanHellemont filed any security interests in the state of Maryland, or that VanHellemont has any other connections with the state. In addition, there is no evidence that VanHellemont was in control of where Varilease Arizona's leased equipment would be located. *Cf. Occidental Fire & Cas. Co. of N.C. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 689 F.Supp. 564, 567–68 (E.D.N.C.1988) (noting that a bank's filing of security interests in the forum state "is not a 'voluntary' effort to do business," and thus not sufficient to confer personal jurisdiction, because the bank does not control where its

---

**11.** Neither party has stated when VanHellemont acquired his security interest in Varilease Arizona's assets. If VanHellemont did not acquire a security interest in the leased equipment until after the MLA came into effect, this would counsel against the exercise of jurisdiction. *Cf. Talegen Corp. v. Signet Leasing &* *Fin. Corp.*, 104 Md.App. 663, 657 A.2d 406, 411–12 (1995) (finding that personal jurisdiction was lacking where an out-of-state defendant with no other contacts with Maryland negotiated an equipment lease with another out-of-state party, and the lease subsequently was assigned to a Maryland corporation).

customers locate their collateral). Under these circumstances, the defendant's conduct and connections to Maryland are not such "that he reasonably should anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

In sum, the plaintiff has failed to establish a prima facie case that VanHellemont "purposefully availed [him]self of the privilege of conducting activities in [Maryland]," such that "the exercise of personal jurisdiction would be constitutionally reasonable." *Carefirst*, 334 F.3d at 397 (internal quotation omitted). The claim against VanHellemont must be dismissed for lack of personal jurisdiction.

## II. Breach of Contract

Harte–Hanks Baltimore alleges breach of contract (count one) and breach of the implied duty of good faith and fair dealing (count two) against all of the defendants, based on their alleged breaches of the MLA. Harte–Hanks Baltimore states that it has met all of its obligations under the MLA and that all of the defendants have breached the MLA, by failing to provide or arrange for maintenance services for the leased equipment and failing "to provide proper equipment as represented by the meter readings." (Compl. at ¶ 42–44.)

The forum state's conflict of law rules determine what substantive law to apply to state law claims in federal court. *See Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975) (per curiam). The MLA contains a choice-of-law provision stating that "[t]he Lease shall be deemed to have been made and delivered in the State of Michigan and shall be governed in all re-

spects by the laws of such State." (Compl. at Ex. 1, MLA, at ¶ 18(a).) The Maryland courts generally honor such choice-of-law contractual provisions, *see Nat'l Glass. Inc. v. J.C. Penney Props., Inc.*, 336 Md. 606, 650 A.2d 246, 248 (1994), and neither party has raised any argument against enforcement of the provision. Accordingly, counts one and two of the plaintiff's complaint are governed by Michigan state law.

Harte–Hanks Baltimore is not a party to the MLA, and therefore ordinarily would be barred under Michigan law from bringing a contractual claim against the defendants unless it is a third-party beneficiary under the contract. *See Krass v. Tri–County Sec., Inc.*, 233 Mich.App. 661, 593 N.W.2d 578, 580–81 (1999); *see also* Mich. Comp. Laws § 600.1405. In the motions hearing before the court, however, counsel for defendants Varilease Arizona and Varilease Michigan stated that those defendants are not seeking dismissal of the claim for breach of contract. Defendant Varilease Arizona also takes this position in its most recent filing with the court, stating that an express contract exists between the plaintiff and Varilease Arizona covering the same subject matter as the plaintiff's claims in the complaint. (Varilease Defs.' Reply at 11, 15.) These defendants thus have voluntarily waived any objection regarding the plaintiff's standing as a third-party beneficiary to enforce the MLA, and there are no other grounds for dismissing count one against these defendants.[12]

Nonetheless, count two must be dismissed as to Varilease Arizona and Varilease Michigan, because Michigan law does not recognize an independent cause of action for breach of the implied duty of good faith and fair dealing. *See Ulrich v.*

---

**12.** Since the claims under counts one and two must be dismissed on other grounds as to defendants MVSS and CitiCapital, the court need not address whether Harte–Hanks Baltimore would have standing as a third-party beneficiary under the MLA.

*Federal Land Bank of St. Paul,* 192 Mich. App. 194, 480 N.W.2d 910, 911 (1991) (per curiam). Although a plaintiff may base a claim for breach of contract under Michigan law on a breach of the implied duty of good faith and fair dealing, breach of the duty does not supply an independent cause of action where the plaintiff already is alleging breach of contract, as in this case. *See Belle Isle Grill Corp. v. City of Detroit,* 256 Mich.App. 463, 666 N.W.2d 271, 279–80 (2003) (per curiam); *Ulrich,* 480 N.W.2d at 911–12. Moreover, under Michigan law an implied duty of good faith and fair dealing is recognized only when one party to a contract has made its own performance a matter of its own discretion, *see Stephenson v. Allstate Ins. Co.,* 141 F.Supp.2d 784, 790 (E.D.Mich.2001), a factual circumstance that has not been alleged and does not arise under the MLA.

■■■■ Counts one and two of the plaintiff's complaint cannot stand against MVSS, because there is no contractual relationship between MVSS and Harte–Hanks Baltimore. *See Thomas v. Leja,* 187 Mich.App. 418, 468 N.W.2d 58, 60 (1991) (stating that among the essential elements of a contract under Michigan law are parties competent to contract and mutuality of agreement). MVSS was neither a party to the MLA nor a successor to any of the rights or duties under the MLA. The plaintiff argues that the allegations of the complaint are sufficient to state an implied-in-fact contract between MVSS and Harte–Hanks Baltimore regarding maintenance services. Under Maryland law,[13] a contract may be implied in fact where the conduct of the parties shows a meeting of the minds and mutual intent to contract. *See Mogavero v. Silverstein,* 142 Md.App. 259, 790 A.2d 43, 52–53 (2002). The complaint states that MVSS "informed" Harte–Hanks Baltimore that it would be taking over the maintenance obligation for the leased equipment from Varilease Arizona. (Compl. at ¶ 33.) MVSS apparently provided these maintenance services to Harte–Hanks Baltimore pursuant to an existing contract, the MLA, and Harte–Hanks Baltimore neither paid nor promised to pay MVSS for these services. (*Id.* at ¶ 34–35.) The parties thus did not evince an intent to form a new contract, apart from any existing obligations under the MLA, and the court will not imply a separate contract.

■■■■ Counts one and two also cannot stand against CitiCapital, because it has not assumed any obligations or duties under the MLA. Under Michigan law, the acceptance by an assignee of the assignor's rights under a contract does not automatically create a duty on the part of the assignee to perform any unperformed obligations of the assignor under the contract. *See Keyes v. Scharer,* 14 Mich.App. 68, 165 N.W.2d 498, 501 (1968). If the assignee does not expressly assume any remaining obligations, then the issue becomes a question of contract interpretation, based on the language of the assignment and the surrounding circumstances. *See id.* In this case, the notices of assignment provided to Harte–Hanks National clearly state:

> LESSOR has assigned to CitiCapital as security all monies due or to become due to LESSOR under the Contract and all

---

**13.** Under Maryland choice-of-law rules, a contractual claim (including a claim for an implied contract) is governed by the law of the place where the contract is made, which is the place where the last act required to make a contract binding occurs. *See Konover Prop. Trust, Inc. v. WHE Assocs., Inc.,* 142 Md.App. 476, 790 A.2d 720, 728–29 (2002). In this case, any implied contract between MVSS and Harte–Hanks Baltimore would have arisen in the state where the parties reached a mutual agreement, presumably in Maryland.

rights and privileges of LESSOR under the Contract except that CitiCapital shall not be chargeable with any obligations or liabilities thereunder to Customer and Customer promises to settle all claims against LESSOR directly with LESSOR and hereby waives, relinquishes and disclaims as to CitiCapital all counterclaims, rights of set-off and defenses Customer may have against LESSOR.

(Compl. at Exs. 2 and 3, at ¶ C.) Further, under the MLA Harte–Hanks National agreed that "it shall not look to any Assignee to perform any of Lessor's obligations under the Lease." (*Id.* at Ex. 1, MLA, at ¶ 10(b).) Finally, Harte–Hanks Baltimore does not allege that CitiCapital has attempted to assume any of Varilease Arizona's obligations under the MLA, nor expressed its intent to assume these obligations. The language of the MLA and the assignments, as well as the surrounding circumstances, indicate that CitiCapital has not assumed any obligations under the MLA, and thus cannot be held liable for breach of contract or breach of the implied duty of good faith and fair dealing.

 In response, Harte–Hanks Baltimore argues that the court should not decide the enforceability of the lease and the assignments on a motion to dismiss, because the contractual language in question is ambiguous. The plaintiffs are correct that if the contractual language in question is ambiguous, then the contract may not be construed and applied as a matter of law on a motion to dismiss. *See Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.,* 991 F.2d 94, 97 (4th Cir. 1992); *Wolman v. Tose,* 467 F.2d 29, 33–34 (4th Cir.1972). If contractual language is clear and unambiguous, however, then the court must apply the plain meaning of that language and enforce the contract. *See Wright v. DaimlerChrysler Corp.,* 220 F.Supp.2d 832, 843 (E.D.Mich.2002). The interpretation and application of unambiguous contractual language is a question of law, which a court may decide on a motion for summary disposition. *See Rossow v. Brentwood Farms Dev., Inc.,* 251 Mich. App. 652, 651 N.W.2d 458, 461–62 (2002). Under Michigan law, contractual language is considered unambiguous when it is capable of only one reasonable interpretation. *See Wright,* 220 F.Supp.2d at 843; *Rossow,* 651 N.W.2d at 462. In the instant case, the ordinary and plain meaning of the provisions in the assignments and the MLA cited above are susceptible of only one reasonable interpretation—that CitiCapital did not assume any obligations under the MLA, and cannot be liable for breach of contract.[14]

## III. Unjust Enrichment

Harte–Hanks Baltimore alleges that it is entitled to recover from the defendants on a theory of quantum meruit or unjust enrichment (count three).[15] Harte–Hanks

---

**14.** At the motions hearing in this case, the plaintiff suggested that the parties did not intend for Harte–Hanks Baltimore to assume an unconditional duty to continue making the lease payments under the MLA if the lessor (or its assignee) ceased providing maintenance services for the leased equipment. Even if there is parol evidence to support this interpretation of the contract, it cannot be admitted to vary the clear and unambiguous language in the contract, particularly in the face of an express integration clause in ¶ 18(b) of the MLA. *See UAW–GM Human Res.*

*Ctr. v. KSL Recreation Corp.,* 228 Mich.App. 486, 579 N.W.2d 411, 414–15 (1998).

**15.** The plaintiff's complaint cites both quantum meruit and unjust enrichment. Many state courts do not distinguish between these two theories of liability. *See, e.g., Landi v. Arkules,* 172 Ariz. 126, 835 P.2d 458, 467 (Ariz.App.1992); *City of Marshall v. City of Casey,* 177 Ill.App.3d 1065, 127 Ill.Dec. 292, 532 N.E.2d 1121, 1123 (1989); *Roznowski v. Bozyk,* 73 Mich.App. 405, 251 N.W.2d 606, 608 (1977); *Watson Elec. Constr. Co. v. Sum-*

Baltimore states that it has provided, and the defendants have accepted, lease payments that include payment for maintenance services, which the defendants have refused to provide and/or have denied their responsibility to provide. (Compl. at ¶ 51–53.) Harte–Hanks Baltimore seeks "an amount equal to the value of the services paid for but not provided by the Defendants." (*Id.* at ¶ 54.)

██ The defendants argue that Harte–Hanks Baltimore cannot state a claim for unjust enrichment as to Varilease Arizona and Varilease Michigan, because of the alleged existence of an express contract between the same parties covering the same subject matter. This argument cannot extend to Varilease Michigan, because the defendants continue to dispute the existence of a written contract between Varilease Michigan and Harte–Hanks Baltimore by arguing that the MLA assignment to Varilease Michigan is invalid. Harte–Hanks Baltimore thus may plead breach of contract and unjust enrichment as alternative theories of liability against Varilease Michigan. *See Convergent Group Corp. v. County of Kent,* 266 F.Supp.2d 647, 661 (W.D.Mich.

2003); *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.,* 190 F.Supp.2d 785, 792 (D.Md.2002). As to Varilease Arizona, both parties agree that an express contract exists between Harte–Hanks Baltimore and Varilease Arizona covering the same subject matter. A claim for unjust enrichment against Varilease Arizona would be governed by Arizona law,[16] and Harte–Hanks Baltimore might be able to proceed with such a claim under Arizona law despite the existence of a written contract. *See Adelman v. Christy,* 90 F.Supp.2d 1034, 1045 (D.Ariz.2000) (citing *USLife Title Co. of Ariz. v. Gutkin,* 152 Ariz. 349, 732 P.2d 579, 585 (Ariz.App.1986)). However, both parties agreed under the MLA that their contract would be governed in all respects by Michigan law, and under Michigan law a plaintiff may not state a claim for unjust enrichment if there is an express contract governing the same subject matter. *See Belle Isle Grill,* 666 N.W.2d at 280. Michigan law governs the initial question of whether the MLA precludes a claim for unjust enrichment, and the claim against Varilease Arizona must be dismissed.[17] The claim for unjust enrichment also must

mit Cos., LLC, 587 S.E.2d 87, 92 (N.C.App. 2003). Count three of the complaint is best described as a claim for unjust enrichment, seeking to imply a contract in law where no mutual agreement exists. *See, e.g., City of Marshall,* 127 Ill.Dec. 292, 532 N.E.2d at 1123; *Watson Elec. Constr.,* 587 S.E.2d at 92.

**16.** As stated, under Maryland choice-of-law rules a contractual claim (including a claim for quantum meruit or unjust enrichment) is governed by the law of the place where the contract is made, which is the place where the last act required to make a contract binding occurs. *See Konover Prop. Trust,* 790 A.2d at 728–29. In this case, the jurisdictions where the contracts (if any) were made are the states where the various defendants would have received and retained payments from Harte–Hanks Baltimore, and thus would have been unjustly enriched—Arizona for Varilease

Arizona, Illinois for CitiCapital, Michigan for Varilease Michigan, and North Carolina for MVSS.

**17.** Even if the existence of an express contract between Harte–Hanks Baltimore and Varilease Arizona did not bar the claim for unjust enrichment, the claim still would fail because there is no allegation that Varilease Arizona failed to provide maintenance services at any point while Harte–Hanks Baltimore was making lease payments to it. Varilease Arizona's retention of the lease payments thus was justified under the MLA, and Varilease Arizona was not unjustly enriched. *See Cmty. Guardian Bank v. Hamlin,* 182 Ariz. 627, 898 P.2d 1005, 1008 (Ariz.App.1995) (noting that one of the required elements for unjust enrichment under Arizona law is the absence of a justification for the defendant's enrichment).

be dismissed as to Varilease Michigan and MVSS, because these defendants never received any benefits from the plaintiff. A claim for unjust enrichment generally requires that the defendant accepted a benefit from the plaintiff, and that the defendant's retention of the benefit violates principles of equity or fairness, or is unjustified. *See Clark v. TAP Pharm. Prods., Inc.*, 343 Ill.App.3d 538, 278 Ill. Dec. 276, 798 N.E.2d 123, 133 (2003); *Belle Isle Grill*, 666 N.W.2d at 280; *Southeastern Shelter Corp. v. BTU, Inc.*, 154 N.C.App. 321, 572 S.E.2d 200, 206 (2002). The plaintiff does not allege that Varilease Michigan or MVSS received any lease payments or other benefits from Harte–Hanks Baltimore or Harte–Hanks National, and these defendants thus have not been unjustly enriched by the plaintiff. *See Belle Isle Grill*, 666 N.W.2d at 280 (stating that an essential element of unjust enrichment under Michigan law is receipt of a benefit by the defendant from the plaintiff); *Southeastern Shelter*, 572 S.E.2d at 206 (stating than an essential element of unjust enrichment under North Carolina law is that the plaintiff conferred a benefit on the defendant). Although Harte–Hanks Baltimore argues that Varilease Michigan and MVSS received benefits indirectly from the plaintiff, through CitiCapital, no such facts are alleged in the complaint, and the plaintiff cites no authority establishing that the indirect receipt of benefits can support a claim for unjust enrichment.

■ As to CitiCapital, the plaintiff cannot state a claim for unjust enrichment because CitiCapital's retention of the lease payments without providing maintenance services in return did not violate fundamental principles of justice, equity, and good conscience. *See Clark*, 278 Ill.Dec. 276, 798 N.E.2d at 133 (stating that for an unjust enrichment claim under Illinois law a plaintiff must establish that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of that benefit violates fundamental principles of justice, equity and good conscience). As stated, CitiCapital never assumed the duty to provide maintenance services or any other obligations to Harte–Hanks Baltimore or Harte–Hanks National under the MLA. (Compl. at Exs. 2 and 3, at ¶ C.) Moreover, Harte–Hanks National had agreed under the MLA and the assignments to CitiCapital that Harte–Hanks National's obligation to continue making payments under the MLA was absolute and unconditional. (*Id.* at Ex. 1, MLA, at ¶ 5; *id.* at Exs. 2 and 3, at ¶ B.) Under these circumstances, CitiCapital's retention of the lease payments from Harte–Hanks Baltimore without providing or arranging for any maintenance services in return did not violate fundamental principles of justice, equity, and good conscience.

Harte–Hanks Baltimore argues in response that the court should not decide the enforceability of the lease and the assignments on a motion to dismiss, because the contractual language in question is ambiguous. The ordinary and plain meaning of the contractual language regarding the duties and obligations of CitiCapital and Harte–Hanks National is clear and unambiguous, however, and the court must enforce the MLA and the assignments as written. *See Wright*, 220 F.Supp.2d at 843; *Rossow*, 651 N.W.2d at 461–62.[18]

---

18. As stated, even if there is parol evidence to suggest that the parties did not intend for Harte–Hanks National to assume an unconditional duty to pay if the maintenance services ceased, this evidence cannot be admitted to vary the clear and unambiguous language in the contract, particularly in the face of an express integration clause. *See UAW–GM Human Resource Ctr. v. KSL Recreation Corp.,*

Provisions requiring a lessee to continue making lease payments under all circumstances, referred to as "hell or high water" clauses, are common in finance leases and uniformly have been upheld. *See, e.g., Colo. Interstate Corp. v. CIT Group/Equipment Fin., Inc.,* 993 F.2d 743, 748–49 (10th Cir.1993); *Wells Fargo Bank N.W., N.A. v. Taca Int'l Airlines, S.A.,* 247 F.Supp.2d 352, 361 (S.D.N.Y.2002); *Leasetec Corp. v. Orient Systems, Inc.,* 85 F.Supp.2d 1310, 1316–1317 (S.D.Fla.1999) (collecting cases). The requirement is codified under Michigan law as to finance leases, *see* Mich. Comp. Laws Ann. § 440.2937, and the MLA states that it is a finance lease (Compl. at Ex. 1, MLA, at ¶ 8(b) and 18(k)). Harte–Hanks Baltimore cites no contrary authority, but argues that this case is distinguishable because the MLA covered both equipment and maintenance services. This distinction does not alter the plain meaning of the "hell or high water" clause, and does not affect its enforceability. *See In re O.P.M. Leasing Services, Inc.,* 21 B.R. 993, 1005–07 (Bkrtcy.S.D.N.Y.1982) (enforcing a hell or high water clause in a contract involving monthly reimbursements for maintenance services for leased equipment). The provisions of the MLA and the assignments must be enforced, and preclude the plaintiff's claim that CitiCapital was unjustly enriched by retaining the lease payments while failing to provide or arrange for maintenance services.

## IV. Estoppel

Harte–Hanks Baltimore claims that the defendants should be estoped from refusing to provide or pay for maintenance services for the leased equipment (count four).

The defendants first argue that this count must be dismissed as to all of the defendants, because neither Maryland nor Michigan law recognizes an independent cause of action for equitable estoppel. If the plaintiff's complaint is understood as asserting a claim for equitable estoppel, then the defendants are correct. *See Catholic Univ. of Am. v. Bragunier Masonry Contractors, Inc.,* 139 Md.App. 277, 775 A.2d 458, 475 (2001) (stating that equitable estoppel can be raised as a defense or to avoid a defense, but not as an affirmative cause of action); *Lakeside Oakland Dev., L.C. v. H & J Beef Co.,* 249 Mich. App. 517, 644 N.W.2d 765, 770 (2002) (stating that equitable estoppel is not an independent cause of action, but rather a doctrine that prevents the other party "from asserting or denying the existence of a particular fact"). Even if Harte–Hanks Baltimore could raise a defense of equitable estoppel in response to a specific claim by the defendants, it cannot use this argument to state a cause of action in its complaint.

In response, Harte–Hanks Baltimore now characterizes count four as stating a claim for promissory estoppel. Under Maryland law,[19] the elements of a claim for promissory estoppel are (1) a clear and definite promise by the defendant, (2) a reasonable expectation by the defendant that the promise will induce action or forbearance by the plaintiff, (3) the promise does induce actual and reasonable action or forbearance by the plaintiff, and

---

228 Mich.App. 486, 579 N.W.2d 411, 414–15 (1998).

**19.** As stated, under Maryland choice-of-law rules, a contractual claim is governed by the law of the place where the contract is made, which is the place where the last act required to make a contract binding occurs. *See Konover Prop. Trust,* 790 A.2d at 728–29. For a claim of promissory estoppel, this should be the jurisdiction where the plaintiff allegedly relied on the promise and suffered a detriment—in this case, Maryland.

(4) a resulting detriment to the plaintiff that can only be avoided by enforcement of the promise. *See Mogavero,* 790 A.2d at 51. Promissory estoppel is "an equitable remedy that permits recovery where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery." *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.,* 262 F.Supp.2d 618, 626 (D.Md.2003) (internal quotation omitted); *see also Pavel Enters., Inc. v. A.S. Johnson Co., Inc.,* 342 Md. 143, 674 A.2d 521, 531 (1996) (describing promissory estoppel as a remedy allowing recovery when a contract claim would fail, e.g., for lack of consideration or violation of the statute of frauds).

 Harte–Hanks Baltimore cannot state a claim for promissory estoppel against CitiCapital, because there are no allegations that CitiCapital made any clear and definite promises to either Harte–Hanks Baltimore or Harte–Hanks National. The claim for promissory estoppel also fails as to Varilease Arizona, because of the undisputed existence of an express, otherwise enforceable contract between the parties governing the same subject matter. *See Odyssey Travel Ctr.,* 262 F.Supp.2d at 626; *Pavel Enters.,* 674 A.2d at 531.[20] Varilease Michigan made a clear and definite promise in the Notice and Acknowledgment dated November 15, 2002 to assume all of the lessor's rights and obligations under the lease, satisfying the first element of a promissory estoppel claim. (Compl. at Ex. 4.) However, the facts alleged do not establish the second element, that Varilease Michigan reasonably should have expected its promise to induce action or forbearance by Harte–Hanks Baltimore. The Notice and Acknowledgment from Varilease Michigan is addressed to Harte–Hanks National, and the plaintiff's complaint does not sufficiently allege that Varilease Michigan was aware of the existence of Harte–Hanks Baltimore, a separate legal entity, or the relationship of Harte–Hanks Baltimore to the MLA.

Even if Harte–Hanks Baltimore could establish that Varilease Michigan should have expected Harte–Hanks Baltimore to rely on the promise in the Notice and Acknowledgment, Harte–Hanks Baltimore also has not sufficiently alleged induced reliance and a resulting detriment. Harte–Hanks Baltimore states that it never made its own arrangements to provide maintenance services for the leased equipment, and that it suffered a detriment when the defendants stopped providing these maintenance services in July 2003 and Harte–Hanks Baltimore had to arrange for such services with another company "at considerable additional expense."[21] (*Id.* at 58–59.) The problem with this reasoning is that Harte–Hanks Baltimore did not change its position in response to the new promise by Varilease Michigan. From the beginning of the

---

**20.** On the other hand, Harte–Hanks Baltimore is not barred from pleading alternative theories of liability as to Varilease Michigan, which continues to dispute the existence of a written contract with Harte–Hanks Baltimore. Any claim against Varilease Michigan for promissory estoppel would be viable only if the written assignment of the MLA from Varilease Arizona to Varilease Michigan is not enforceable on a breach of contract theory. *See Odyssey Travel Ctr.,* 262 F.Supp.2d at 626; *Pavel Enters.,* 674 A.2d at 531.

**21.** This claim of detrimental reliance is distinct from Harte–Hanks Baltimore's claim of detrimental reliance under the fraud claims, where Harte–Hanks Baltimore states that it entered into the MLA and continued to make lease payments under the MLA on the basis of fraudulent misrepresentations. *See infra.* Varilease Michigan's response to the count for promissory estoppel does not address this claim, but instead focuses on the lease payments under the MLA as the alleged detrimental reliance

lease term, Harte–Hanks Baltimore did not arrange for maintenance services for the leased equipment because it was relying on the promise by the lessor, Varilease Arizona to provide these services pursuant to the MLA. (Compl. at ¶ 58.) Harte–Hanks Baltimore cannot show that the promise by Varilease Michigan in fact induced any additional action or forbearance.

For the same reason, Harte–Hanks Baltimore cannot state a claim for promissory estoppel against MVSS, because it cannot establish that the promise made by MVSS induced any action or forbearance by Harte–Hanks Baltimore. Although MVSS made a clear and definite promise to take over the daily maintenance services from Varilease Arizona as of January 2003 forward (Compl. at ¶ 33), Harte–Hanks Baltimore did not change its position in response to this promise. As stated, Harte–Hanks Baltimore never arranged for maintenance services for the leased equipment because it was relying on the promise by the lessor, Varilease Arizona to provide these services pursuant to the MLA. (Compl. at ¶ 58.) MVSS would not have reasonably expected its promise to induce any additional action or forbearance by Harte–Hanks Baltimore, and Harte–Hanks Baltimore cannot show that the promise by MVSS in fact induced any additional action or forbearance.

Moreover, Harte–Hanks Baltimore cannot show that any detriment resulting from the promises by Varilease Michigan and MVSS cannot be remedied by other means. Harte–Hanks Baltimore currently is paying an additional $40,000 per month for maintenance services for the leased equipment. In the end, this detriment results from a breach of the MLA itself, rather than from any additional promises made by Varilease Michigan or MVSS. If the purported assignment of the lease to Varilease Michigan is invalid, then Harte–Hanks Baltimore still has a remedy for breach of contract against Varilease Arizona. A contract will be implied as an equitable remedy only when no express contract exists governing the same subject matter. *See Odyssey Travel Center,* 262 F.Supp.2d at 626. Because it already has a contractual remedy for the alleged detriment, Harte–Hanks Baltimore cannot claim that "justice warrants a recovery," *Odyssey Travel Center,* 262 F.Supp.2d at 626, or that any resulting detriment "can only be avoided by enforcement of the promise" by MVSS, *Mogavero,* 790 A.2d at 51.

## V. Fraud

■ Harte–Hanks Baltimore alleges that the defendants have committed the intentional tort of fraud, by misrepresenting to Harte–Hanks Baltimore that the MLA had been assigned from Varilease Arizona to Varilease Michigan (count five), and by turning back the meters on the leased equipment to cover up extensive prior usage (count six).[22] As to the first claim, Harte–Hanks Baltimore states that Varilease Michigan and Varilease Arizona represented that the MLA had been assigned, that they now deny this assignment, and that Harte–Hanks Baltimore relied on this false representation in continuing to make lease payments to CitiCapital. (Compl. at ¶ 62–64.) As to the second claim, Harte–Hanks Baltimore states that it relied on the defendants' false representations as to the prior usage of the leased equipment in the formation of the MLA, and that the entire transaction should be declared void *ab initio.* (*Id.* at ¶ 66–67.)

---

**22.** Count six is brought against all of the defendants, while count five is brought against all of the defendants except for CitiCapital.

The claim of fraud regarding the lease assignment in count five fails to meet the requirement of particularized pleading under Fed.R.Civ.P. 9(b) as to MVSS, and indeed fails to establish any basis for connecting MVSS to any alleged misrepresentations. Under Fed.R.Civ.P. 9(b), "the circumstances constituting fraud" must be stated with particularity in the complaint. This generally requires a description of "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir.1999) (internal quotation omitted). The complaint alleges that Harte–Hanks Baltimore received a Notice and Acknowledgment dated November 15, 2002 and signed by the Chief Financial Officer of Varilease Michigan, Gary F. Miller, on behalf of Varilease Michigan and Varilease Arizona, stating that Varilease Arizona had sold and assigned all of its rights and obligations under the MLA to Varilease Michigan. (Compl. at ¶ 24–27.) These allegations do not mention MVSS or in any way suggest that MVSS made any representations to Harte–Hanks Baltimore. *Cf. Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 250 (D.Md.2000) (stating that a plaintiff must do more than merely assert "conclusory allegations of fraud against multiple defendants without identifying each individual defendant's participation in the alleged fraud").[23]

As to Varilease Arizona and Varilease Michigan, Harte–Hanks Baltimore cannot state a claim for fraud regarding the lease assignment because it cannot establish actual reliance on the alleged misrepresentation or any resulting injury. To establish a claim for fraudulent misrepresentation under Maryland law,[24] a plaintiff must allege "(1) that the defendant made a false representation to the plaintiff; (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation." *Sass v. Andrew*, 152 Md.App. 406, 832 A.2d 247, 260 (2003) (quoting *Maryland Envtl. Trust v. Gaynor*, 370 Md. 89, 803 A.2d 512, 516 (2002)). Harte–Hanks Baltimore's claim that it continued to make lease payments to CitiCapital in reliance on the purported assignment to Varilease Michigan, and thus was injured, is contradicted by the terms of the MLA. As noted, Harte–Hanks Baltimore had assumed an absolute and unconditional obligation under the MLA to continue making lease payments. (Compl. at Ex. 1, MLA, at ¶ 5; *id.* at Exs. 2 and 3, at ¶ B.) Given this pre-existing and absolute duty,

---

**23.** As to defendants Varilease Arizona and Varilease Michigan, on the other hand, Harte–Hanks Baltimore has sufficiently pled the circumstances allegedly constituting fraud by identifying the specific communication that forms the basis for its fraud claim, including the date, place, and contents of the representation, and the speaker and the parties whom the speaker represented. *See Harrison*, 176 F.3d at 784.

**24.** Under Maryland choice-of-law rules, a claim for the tort of fraud is governed by the law of the place where the injury occurred, which is the place where the last act required to complete the tort occurred. *See Philip Morris, Inc. v. Angeletti*, 358 Md. 689, 752 A.2d 200, 230–31, 233 n. 28 (2000). In this case, Harte–Hanks Baltimore alleges that it received the false notice of assignment in Maryland, and relied on it and suffered injury by continuing to make lease payments in Maryland.

Harte–Hanks Baltimore cannot now claim that it continued to make the lease payments in reliance on the lease assignment, or that these continued payments constitute a resulting injury. Harte–Hanks Baltimore has not alleged that it otherwise relied on or was injured as a result of the purported assignment to Varilease Michigan, and thus it cannot state a claim for fraud.

The claim of fraud regarding the meters on the leased equipment in count six fails to meet the requirements of particularized pleading under Fed.R.Civ.P. 9(b) as to all of the defendants. The complaint alleges that the meters on the leased equipment indicated limited prior usage at the time of installation, but that Harte–Hanks Baltimore has learned that the meters had been altered before installation and that the printers had substantially more prior usage. (Compl. at ¶ 16–18.) The claim must be dismissed as to MVSS, CitiCapital, and Varilease Michigan, because there are no allegations suggesting that these defendants were involved with the transaction or the leased equipment at the time of installation, or that they subsequently became aware of the alleged misrepresentations prior to the filing of this suit. *Cf. Adams,* 193 F.R.D. at 250 (stating that a plaintiff must do more than merely assert "conclusory allegations of fraud against multiple defendants without identifying each individual defendant's participation in the alleged fraud").[25] Even as to Varilease

Arizona the complaint fails to comply with Rule 9(b), because it provides no information regarding which machines displayed erroneous readings, what the readings were, on what basis the plaintiff posits that these readings were false, or what evidence suggests that Varilease Arizona was responsible for or aware of the erroneous readings. *Cf. Giannaris v. Cheng,* 219 F.Supp.2d 687, 694–95 (D.Md.2002) (stating that the plaintiff's original complaint did not comply with Rule 9(b), because it "failed to specify which Defendant made which statements, and omitted factual allegations as to why the alleged statements were false").

The plaintiff has submitted additional information regarding the meter fraud, but the claim still fails to meet the requirements of Rule 9(b) as to Varilease Arizona, even if all of the additional factual allegations are considered as part of the plaintiff's complaint. According to two affidavits by Lin Wells, Managing Director of Harte–Hanks Baltimore: (1) Varilease Arizona provided documentation of the current meter readings at the time of installation, on dates ranging from November 20, 2001 to January 24, 2002, (2) the manufacturer of the equipment, Oce, had recorded the meter readings for five of the six printers prior to their installation at Harte–Hanks Baltimore, on dates ranging from December 15, 2000 through September 26, 2001, and (3) the meter readings on four of these five printers were millions of units higher when measured by Oce com-

---

25. The plaintiff also argues that CitiCapital may be held liable for any fraud committed by Varilease Arizona or Varilease Michigan, because these entities acted as its billing agent under the MLA, and CitiCapital as principal is liable for any fraud by its agents. This argument also fails because the plaintiff has not alleged that any agency relationship or other connection existed between CitiCapital and the other defendants at the time of the alleged fraud, months before CitiCapital became involved, or that the fraudulent representations were within the apparent or actual scope of whatever limited agency relationship subsequently developed between CitiCapital and the Varilease entities. *See* Restatement (Second) of Agency § 257 (stating the general rule that a principal is liable for loss caused by a third party's reliance on a tortious representation by the principal's agent if the representation was authorized, apparently authorized, or within the power of the agent to make for the principal).

pared to the readings recorded by Varilease Arizona at the time of installation. (Pl.'s Reply re: Prelim. Inj. at Ex. 1, Wells Aff., at ¶ 10–14, Exs. B–D.) Wells also states that (1) Harte–Hanks Baltimore leased the equipment with the understanding that it was pre-owned but minimally used, (2) Varilease Arizona demonstrated this by the equipment's meter readings, and (3) when Harte–Hanks Baltimore entered into the MLA, the meter readings indicated limited prior use. (Pl.'s Mem. re: Prelim. Inj. at Ex. 1, Wells Aff., at ¶ 4.) Even when all reasonable inferences are made from these additional facts, there is no specific allegation or evidence implicating Varilease Arizona or its employees or agents in the alleged turning back of the meters.[26]

In any event, the facts as stated by Harte–Hanks Baltimore also fail to establish that Harte–Hanks Baltimore actually relied on any misrepresentations. *See*

Sass, 832 A.2d at 260; *Campbell v. Sullins*, 257 Mich.App. 179, 667 N.W.2d 887, 898 (2003).[27] The allegations in the complaint indicate that Harte–Hanks Baltimore did not become aware of the meter readings until the time of installation, months after Harte–Hanks National had agreed to the terms of the MLA. (Compl. at ¶ 17–18.) If these allegations are correct, then Harte–Hanks Baltimore cannot claim that it actually relied on the meter readings in agreeing to the terms of the MLA, as the complaint states. (*Id.*) If, as the additional facts stated in Wells's affidavits suggest,[28] Varilease Arizona made some representations to Harte–Hanks Baltimore regarding the prior usage of the leased equipment before Harte–Hanks National entered into the MLA, it remains unclear whether Harte–Hanks Baltimore actually relied on these representations.[29] It was a separate legal entity, Harte–Hanks National, that entered into the

---

**26.** For example, it is not clear which party or parties were in possession of the printers in question between the two sets of meter readings cited in Wells's affidavit. Unless Varilease Arizona was in possession of the leased equipment throughout this time period, it is not reasonable to infer that it was responsible for the altered meter readings, absent additional allegations or evidence implicating Varilease Arizona or its employees or agents.

**27.** As stated, under Maryland choice-of-law rules a claim for the tort of fraud is governed by the law of the place where the injury occurred, which is the place where the last act required to complete the tort occurred. *See Philip Morris*, 752 A.2d at 230–31, 233 n. 28. However, in the case of fraud it is unclear which substantive law governs if the wrongful act and the plaintiff's injury occurred in two different jurisdictions. *See id.* at 233 n. 28. Given the vague and somewhat contradictory allegations regarding this fraud claim, it remains unclear where all of the requisite acts allegedly occurred. The parties have applied both Maryland and Michigan law in their arguments, and the distinctions between the requirements for fraud in these

two jurisdictions are not determinative at this point, so the court will apply both Maryland and Michigan law to this claim. *Compare Sass*, 832 A.2d at 260, *with Campbell*, 667 N.W.2d at 898.

**28.** The additional allegations contained in Wells's affidavits are somewhat contradictory on this point. Wells refers specifically to the meter readings that were provided at the time of installation (Pl.'s Reply re: Prelim. Inj. at Ex. 1, Wells Aff., at ¶ 10–14, Exs. B–D), but also states generally that the meter readings indicated limited prior use at the time that the MLA was entered (Pl.'s Mem. re: Prelim. Inj. at Ex. 1, Wells Aff., at ¶ 4).

**29.** The plaintiff's allegations regarding these earlier representations also fail to meet the requirements of Rule 9(b), even when the facts stated by Wells are considered. Wells's affidavits fail to provide any details regarding the time, place, contents, or speaker of any representations by Varilease Arizona regarding the prior usage of the equipment, other than the meter readings that were provided at the time of installation. *See Harrison*, 176 F.3d at 784.

MLA, and any facts regarding the role that Harte–Hanks Baltimore played in the decision to enter into the MLA on the terms provided are absent from the filings before the court. Harte–Hanks Baltimore alleges that it makes the monthly lease payments under the MLA, and thus it may have suffered a detriment if it assumed this financial responsibility in reliance on false representations made by Varilease Arizona, but such a claim would require additional allegations regarding the specific actions that Harte–Hanks Baltimore took in reliance on any such false representations.

Even when the additional facts alleged in Wells's affidavits are considered, count six must be dismissed for failure to comply with Rule 9(b). Harte–Hanks Baltimore has failed to satisfy the court "(1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784. However, this fraud claim will be dismissed with leave to amend as to Varilease Arizona.

## VI. Declaratory Judgment and Injunctive Relief

Finally, Harte–Hanks Baltimore seeks a declaratory judgment against all of the defendants, related to the parties' rights and obligations under the MLA (count seven). The federal Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . ." 28 U.S.C. § 2201. Of course, a plaintiff seeking a declaratory judgment still must be able to state a claim upon which relief may be granted. *See Miller v. Pac. Shore Funding*, 224 F.Supp.2d 977, 993 (D.Md.2002). As stated, Harte–Hanks

Baltimore has failed to state any claim upon which relief may be granted against MVSS, so this count must be dismissed as to MVSS. With regard to Varilease Arizona and Varilease Michigan, any declaratory relief regarding the parties' rights and obligations under the MLA would be duplicative of the claims already alleged, and thus this count must be dismissed as to these defendants as well.

With respect to CitiCapital, however, Harte–Hanks Baltimore may be entitled to a declaratory judgment regarding the parties' rights and obligations under the MLA. The court notes that if Harte–Hanks Baltimore can establish fraud in the inducement to the MLA, as alleged under count six, then the contract will be voidable at the plaintiff's option. *See Martin v. City of East Lansing*, 249 Mich. App. 288, 642 N.W.2d 700, 703 (2001) (noting the general rule that fraud in the inducement renders a contract voidable, but not void). If the contract is voided, then declaratory relief would be appropriate to adjudicate the remaining disputes between CitiCapital and Harte–Hanks Baltimore, and in particular whether Harte–Hanks Baltimore may cease its lease payments to CitiCapital and whether CitiCapital may repossess the leased equipment. *See Continental Cas. Co. v. Fuscardo*, 35 F.3d 963, 965–66 (4th Cir. 1994) (stating that declaratory relief is appropriate when it "(i) will serve a useful purpose in clarifying and settling the legal relations in issue, and (ii) will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding") (internal quotation omitted). Count seven will be dismissed with leave to amend as to CitiCapital, pending the plaintiff's amendment of its complaint regarding the fraud allegations under count six.

Count eight, in which the plaintiff seeks an injunction barring CitiCapital and the

other defendants from repossessing the leased equipment or requiring further lease payments from Harte–Hanks Baltimore, also is duplicative of the other claims asserted and will be dismissed.

In sum, the plaintiff may proceed on a claim for breach of contract under count one against Varilease Arizona and Varilease Michigan. The claims against defendant Robert VanHellemont will be dismissed for lack of personal jurisdiction. All other claims against all other defendants will be dismissed for failure to state a claim. The court will grant the plaintiff leave to amend count six for fraud as to Varilease Arizona, and count seven for a declaratory judgment as to CitiCapital.